**MILBERG LLP**
JEFF S. WESTERMAN (SBN 94559)
jwesterman@milberg.com
SABRINA S. KIM (SBN 186242)
skim@milberg.com
ANDREW J. SOKOLOWSKI (SBN 226685)
Asokolowski@milberg.com
One California Plaza
300 S. Grand Avenue, Suite 3900
Los Angeles, CA 90071
Telephone: (213) 617-1200
Facsimile: (213) 617-1975

**MILBERG LLP**
ANDREI V. RADO
arado@milberg.com
One Pennsylvania Plaza, 49th Floor
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

*Interim Lead Counsel for Plaintiffs*
[Additional Counsel on Signature Page]

FILED
CLERK, U.S. DISTRICT COURT

NOV - 8 2010

CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| BEVERLY KING and NANCY GLENNON, individually and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> v. <br><br> CITIMORTGAGE, Inc., a member of CITIGROUP Inc., <br><br> Defendant. | CASE NO. CV 10-03792 DSF (PLAx) <br><br> **CLASS ACTION** <br><br> CONSOLIDATED COMPLAINT FOR: <br><br> (1) Breach of Contract; <br> (2) Breach of Implied Covenant of Good Faith and Fair Dealing; <br> (3) Promissory Estoppel; <br> (4) Violation of California Civil Code § 1788 *et seq.*; <br> (5) Violation of California Civil Code § 1785.25(a); <br> (6) Violation of Florida Statute § 501.201 *et seq.*; <br> (7) Violation of California Business and Professions Code § 17500 *et seq.*; and <br> (8) Violation of California Business and Professions Code § 17200 *et seq.* <br><br> **DEMAND FOR JURY TRIAL** |

RECEIVED
BUT
NOT FILED

NOV - 8 2010

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY                          DEPUTY

[Caption Continued on the Following Page]

ORIGINAL

| CONSOLIDATED CLASS ACTION COMPLAINT | | CASE NO.: CV 10-03792 DSF (PLAx) |
|---|---|---|

DOCS\535125v4

| | | |
|---|---|---|
| 1 | HANNA BERNARD, on behalf of herself and all other similarly situated, | ) CASE NO. 10-6292 DSF (PLAx) |
| 2 | | ) |
| 3 | Plaintiff, | ) |
| 4 | v. | ) |
| 5 | CITIMORTGAGE, INC., | ) |
| 6 | Defendant. | ) |
| 7 | MARIA BETANCOURT and PEDRO BETANCOURT, individually and on behalf of all others similarly situated, | ) CASE NO. 2:10-cv-7049 DSF(PLAx) |
| 8 | | ) |
| 9 | Plaintiffs, | ) |
| 10 | v. | ) |
| 11 | CITIMORTGAGE, INC., a New York corporation; CITIBANK, N.A., a national banking association; CITIGROUP, INC., a Delaware corporation; and DOES 1-100, | ) |
| 12 | | ) |
| 13 | Defendants. | ) |
| 14 | CARLA CHUI, MAURIZIO CERDINI, ELIZABETH DANIEL, on behalf of themselves and all others similarly situated, | ) CASE NO. CV 10-7385-DSF (PLAx) |
| 15 | | ) |
| 16 | | ) |
| 17 | Plaintiffs, | ) |
| 18 | v. | ) |
| 19 | CITIMORTGAGE, INC., | ) |
| 20 | Defendant. | ) |
| 21 | | |
| 22 | | |
| 23 | | |
| 24 | | |
| 25 | | |
| 26 | | |
| 27 | | |
| 28 | | |

1    Plaintiffs Beverly King, Nancy Glennon, Hanna Bernard, Carla Chui,
2  Maurizio Verdini, Elizabeth Daniel, Maria Betancourt, and Pedro Betancourt
3  ("Plaintiffs"), individually and on behalf of all others similarly situated, allege the
4  following upon personal knowledge as to their own acts, and upon information and
5  belief as to all other matters.

6                           **NATURE OF THE ACTION**

7    1.    Plaintiffs bring this class action to challenge CitiMortgage's
8  ("Defendant" or "Citi") false promises of affordable loan modifications and failure
9  to comply with its obligations to permanently modify the loans at the end of the
10 trial modification period.  Contrary to Citi's express commitment to "helping our
11 customers facing financial hardship remain in their homes" and "work[ing] with
12 you to find the best option for you," Citi's delay, incompetence and obstruction in
13 the modification process have left countless homeowners – not with lower monthly
14 payments  – but actually worse off than they were before seeking a modification
15 from Citi.   Citi's aggressive solicitations, misrepresentations, and misconduct
16 violate its contractual obligations, undermine the very purpose of affordable loan
17 modifications, and are illegal under California and Florida law.

18   2.    Plaintiffs represent thousands of financially distressed homeowners
19 with mortgages owned and/or serviced by Citi.   As casualties of the global
20 economic crisis following the mortgage industry meltdown, these homeowners
21 already faced serious financial hardship, including unemployment and/or lost
22 income, rendering them unable to sustain their current mortgage payments.

23   3.    Citi exacerbated the mortgage crisis and its reverberating negative
24 effects for its borrowers.  Citi aggressively and falsely advertised its commitment
25 to help homeowners obtain affordable loan modifications, including those
26 available under the federal Home Affordable Modification Program ("HAMP") –
27 a government program designed to alleviate the foreclosure crisis by providing
28

---

| CONSOLIDATED CLASS ACTION COMPLAINT | - 1 - | CASE NO.: CV 10-03792 DSF (PLAx) |

DOCS\535125v4

1  affordable mortgage loan modifications and other foreclosure alternatives to

2  eligible borrowers.[1]   However, after enticing borrowers to apply for loan

3  modifications and obtaining basic eligibility information regarding their income

4  and debts,  Citi consistently delayed, avoided, or otherwise failed at permanently

5  modifying the loans, while racking up illegitimate fees and/or unpaid interest

6  (often added to the principal of the loan) against those borrowers who could least

7  afford them.

8        4.     Specifically, Citi informed Plaintiffs and Class members who applied

9  for a modification that (a) they were prequalified for a loan modification, (b) they

10  would be placed in a 90-day "trial period" during which they could make reduced

11  payments, and (c) the trial modification would become permanent if, consistent

12  with Citi's instructions, they made the reduced payments during the trial period

13  and provided additional documentation to Citi.

14        5.     Plaintiffs and Class members fulfilled their end of the bargain, making

15  timely reduced payments and providing documentation (in many cases more than

16  once).  Despite their compliance, Citi flouted its obligation to permanently modify

17  the loans at the end of the trial modification period.   Instead, Citi subjected

18  Plaintiffs and Class members to trial periods extending far beyond the promised 90

19  days and in some cases over one year.   After more delay, Citi rejected their

20  requests for a permanent modification and often neglected to inform borrowers that

21  their applications were denied.

22        6.     Worse, Citi demanded thousands of dollars in balloon payments and

23  previously undisclosed fees – immediately – which were almost certain to drive

24  Plaintiffs into foreclosure.  In addition, some of the Plaintiffs discovered that Citi

25  reported them as delinquent to credit reporting agencies, even those who were

26

27

28

---

[1] Having taken $45 billion from the United States government as part of the Troubled Assets Relief Program, 12 U.S.C. § 5211 *et seq.* ("TARP"), Citi was subject to mandatory inclusion in HAMP.

1    current on payments when they began the trial period, and despite the fact they

2    made timely reduced payments consistent with Citi's modification instructions.

3        7.    Citi's failure to make permanent, affordable loan modifications in the

4    promised 90-day time frame was inevitable.  Despite aggressively marketing loan

5    modifications to its customers and touting its participation in HAMP, Citi did not

6    allocate the necessary resources to timely or accurately process modification

7    requests.  Citi failed to staff an adequate number of trained, supervised personnel

8    to process the volume of loan modification requests that came in.  Not surprisingly,

9    these poorly equipped personnel often 1) improperly denied modification requests,

10   2) placed borrowers in other "assistance" programs that did not modify the loan

11   terms to make payments more affordable but merely changed the payment

12   schedule with a looming balloon payment; and/or 3) offered worse terms than

13   those for which the borrowers actually qualified.

14       8.    Perversely, Citi's lack of preparedness, delay, and other misconduct in

15   the modification process served to profit Citi with increased fees, interest, principal

16   balances and servicing compensation, at the expense of Plaintiff and Class

17   members who were deprived of an opportunity to cure their delinquencies, pay

18   their loans, and/or save their homes and credit.  Furthermore, relying on Citi's false

19   promises of affordable loan modifications, borrowers lost out on other options to

20   their detriment, including immediate short sale or foreclosure, which would have

21   allowed them to preserve cash on hand and seek cheaper living arrangements such

22   as renting.  Refinancing options likewise disappeared because Citi's inaccurate and

23   misleading credit reporting damaged Plaintiffs' and Class members' credit.  All the

24   while, Plaintiffs and Class members struggled to continue paying Citi large sums

25   of cash, believing that Citi would process their loan modification requests in a

26   timely manner without adverse credit consequences.  Now, having waited months

27   for Citi to process their loan modification requests only to have them either

28

1 delayed or denied, Plaintiffs and Class members find themselves at risk of
2 foreclosure with depleted cash on hand, ruined credit, and few options for
3 alternative living arrangements.

4      9.    Borrowers who were denied permanent modifications through no fault
5 of their own should not find themselves in a worse position than when they applied
6 for a modification. But here, Citi's abject failure to honor its agreements, coupled
7 with its misrepresentations and omissions about how it implemented its
8 "Homeowner Assistance" program, left Plaintiffs and Class members financially
9 devastated.

10     10.   Plaintiffs bring this lawsuit against Citi on behalf of themselves and
11 all others similarly situated, alleging common law claims for breach of contract,
12 breach of the implied covenant of good faith and fair dealing, and promissory
13 estoppel. Plaintiffs also allege statutory violations under California Civil Code
14 section 1788 *et seq.* (the "Rosenthal Fair Debt Collection Practices Act" or
15 "Rosenthal Act"), California Civil Code section 1785.25(a) (the "Consumer Credit
16 Reporting Agencies Act" or "CCRAA"), Florida Statute sections 501.201 *et seq.*
17 (the "Florida Deceptive and Unfair Trade Practices Act" or "FDUTPA"), and
18 California Business and Professions Code sections 17200 *et seq.* and 17500 *et seq.*
19 (the "Unfair Competition Law" or "UCL" and the "False Advertising Law" or
20 "FAL").

21     11.   Plaintiffs seek declaratory and injunctive relief to stop Defendant
22 from their unfair and oppressive actions, as well as damages, restitution, and costs
23 of suit as may be appropriate.

24                      **JURISDICTION AND VENUE**

25     12.   This Court has subject matter jurisdiction pursuant to 28 U.S.C.
26 § 1332(d) because there are at least 100 Class members in the proposed Class, the
27 combined claims of proposed Class members exceed $5,000,000 exclusive of

28

| CONSOLIDATED CLASS ACTION COMPLAINT | - 4 - | CASE NO.: CV 10-03792 DSF (PLAx) |
| --- | --- | --- |

DOCS\535125v4

1  interest and costs, and there are numerous Class members who are citizens of states

2  other than Defendant's state of citizenship.

3       13.    This Court has personal jurisdiction over Defendant because a

4  substantial portion of the wrongdoing alleged in this Complaint took place in this

5  state. Citi is authorized to do business here, has sufficient minimum contacts with

6  this state, and otherwise intentionally avails itself of markets in this state through

7  the promotion, marketing, and servicing of loans in this state so as to render the

8  exercise of jurisdiction by this Court permissible under traditional notions of fair

9  play and substantial justice.

10       14.    Venue is proper pursuant to 28 U.S.C. § 1391(a) because: at least one

11  plaintiff resides here, Citi has hundreds if not thousands of customers in this

12  District, Defendant receives substantial fees and interest from borrowers who hold

13  loans here, and a substantial part of the events or omissions giving rise to the

14  claims asserted herein occurred in this District.

15                 **THE PARTIES**

16       15.    All Plaintiffs are over the age of 18 and have their mortgage loan

17  serviced by Citi.

18       16.    Plaintiffs Beverly King ("King") and Nancy Glennon ("Glennon") are

19  residents of Rancho Cucamonga, California, and jointly hold a mortgage for their

20  home in Rancho Cucamonga.

21       17.    Plaintiff Hanna Bernard ("Bernard") is a resident of South Lake

22  Tahoe, California.

23       18.    Plaintiffs Carla Chui ("Chui") and Maurizio Verdini ("Verdini") are

24  residents of Miami Shores, Florida, and jointly hold a mortgage for their home in

25  Miami Shores.

26       19.    Plaintiff Elizabeth Daniel ("Daniel") is a resident of Vero Beach,

27  Florida.

28

| CONSOLIDATED CLASS ACTION COMPLAINT | - 5 - | CASE NO.: CV 10-03792 DSF (PLAx) |
|---|---|---|

DOCS\535125v4

20.    Plaintiffs Maria Betancourt and Pedro Betancourt (the "Betancourts") are residents of Napa County, California.

21.    Defendant CitiMortgage, Inc. is headquartered in O'Fallon, Missouri, and is the fourth largest mortgage servicer in the country.  Citi is part of Citigroup Inc., a global financial conglomerate based in New York City.

### THE RESIDENTIAL MORTGAGE CRISIS

22.    The collapse of the residential real estate market in 2007 and 2008 and the resulting recession led to an unprecedented foreclosure crisis in the United States.

23.    In 2008, more than two million homes entered foreclosure proceedings.  In 2009, an additional 2.8 million homeowners entered foreclosure. Experts estimate that the numbers will continue to grow and that the number of homes foreclosed in 2010 will be greater than in 2009.[2]

24.    A Congressional Oversight Panel report noted that one in eight U.S. mortgages is currently in foreclosure or default, and each month approximately 250,000 additional foreclosures are initiated.[3]

25.    A home is typically a family's most important asset and investment. The effects of foreclosure on a personal level are understandably devastating. Foreclosure damages credit, making it difficult for families to purchase another home or even rent another place to live.

---

[2] Office of the Special Inspector General for the Troubled Asset Relief Program, *Factors Affecting Implementation of the Home Affordable Modification Program*, March 25, 2010, at 1, *available at* http://www.sigtarp.gov/reports/audit/2010/Factors_Affecting_Implementation_of_t he_Home_Affordable_Modification_Program.pdf.

[3] Congressional Oversight Panel, Oct. 9, 2009 report at 3, *available at* http://cop.senate.gov/documents/cop-100909-report.pdf.

26.     The crippling effects of foreclosures extend beyond just the plight of one household.  Communities also suffer from decreased property values and low tax revenue.[4]

## THE LOAN SERVICING INDUSTRY

27.     Despite the crippling and rippling effects of the mortgage crisis, mortgage servicers like Citi have little incentive to modify loans, and instead have every incentive to precipitate borrower default and ultimately foreclosure.

28.     Mortgage loans are generally originated with the intention of selling them to investors.  Loans can be sold in whole on the secondary market, so that a single investor owns the entire loan, or, more commonly today, securitized.  In securitization, thousands of loans are pooled together in common ownership held by a trust.  Bonds are issued to investors based on the combined, anticipated payment streams of the pooled loans.  The bonds that are issued may be for different categories of payments, such as interest payments, principal payments, prepayment penalties or late payments.  The different groups of bond holders are paid from different categories of money and in different orders.

29.     With the advent of securitization, a new industry of loan servicers has emerged.  Loan servicers collect and process payments on mortgage loans, maintain the records of payments, and are the entities through which any request for a loan modification must pass.

30.     Loan servicers compete for the right to service pools of mortgages at the time the mortgage pool is created.  Securitization agreements (also known as pooling and servicing agreements or PSAs) generally identify a master servicer who receives a portion of payments on a mortgage pool until the mortgage is paid off.  The PSAs provide no meaningful restrictions on individual loan modifications

---

[4] *Id.* at 5

1    and, therefore, loan servicers generally have the ability to approve and analyze

2    loan modifications.

3        31.    Loan servicers derive their income from direct payments based on the

4    principal balance of the pool of loans.  Servicers benefit from keeping principal

5    loan balances high, whether by capitalizing arrears and unpaid fees or by refusing

6    loan modifications with principal reductions.

7        32.    Loan servicers also derive income from fees imposed on borrowers

8    (such as late fees, foreclosure fees, inspection fees, and broker opinion fees which

9    PSAs allow servicers to collect directly from the borrower, or if the home is

10   foreclosed, directly from the top of foreclosure proceeds).  These fees create a

11   profit center for large servicers.

12       33.    Servicers also derive interest income on the float between the time

13   when payments are received from borrowers and when they are passed on to the

14   investors, among other things.  Servicers create interest income by stretching the

15   time to turn over funds – i.e., paying the taxes or insurance late or at the last

16   moment possible – to create more float income.  Thus, prepayments of loans

17   increase the float income because there are then larger amounts of money sitting in

18   the float account, generating interest, until turned over to investors.  Float interest

19   income thus gives servicers an incentive to favor any resolution that involves a

20   prepayment, such as a refinance, a sale of the home, or a foreclosure.

21       34.    Servicers also make additional income through affiliated businesses,

22   such as insurance companies, property valuation companies, and inspection

23   companies.  Servicers contract with these affiliated businesses (which often

24   specialize in providing services for loans in default) for various services and the

25   costs are imposed on borrowers.

26       35.    Loan servicers who fail to modify loans face few consequences.

27   Although investors generally do not have an interest in foreclosure, large mortgage

28

---

CONSOLIDATED CLASS ACTION COMPLAINT | - 8 - | CASE NO.: CV 10-03792 DSF (PLAx)

DOCS\535125v4

pools may involve hundreds of investors with differing views about whether a foreclosure is appropriate. Further, investors may feel the financial pain of default differently because, as alleged above, different investors often own different parts of the security, i.e., principal payments, interest payments, or prepayment penalties and are paid in different order based on their assigned priority.

36.     Even if an investor favors loan modification, investors do not have authority to directly control a loan servicer's actions. Investors generally can only take action through the trustee and only if a majority of the investors agree. Trustees can fire a servicer in rare cases, but this right is seldom invoked and then only when the servicer does not pay monthly payment advances on the loans.

37.     Because of this lack of direct control, loan servicers have little incentive to aggressively pursue loan modifications, especially in light of the compensation scheme described above. First, maintaining borrowers in default and delaying decisions on loan modifications generate profits for loan servicers through late fees, inspection fees, and the like. Second, performing loan modifications is expensive. Third, putting borrowers in a position of refinancing or foreclosure can create additional float interest income and allow servicers to recoup advanced principal and interest payments. Fourth, imposing junk fees and capitalizing arrears can increase principal balances and servicing compensation. These facts actually favor foreclosures and short-term repayment plans, and gives context to Citi's misconduct.

## THE HOME AFFORDABLE MODIFICATION PROGRAM

38.     On October 3, 2008, Congress passed the Emergency Economic Stabilization Act ("EESA") "to immediately provide authority and facilities that the Secretary of the Treasury can use to restore liquidity and stability to the financial system of the United States." 12 U.S.C. §§ 5201, *et seq*.

39.     One of the main purposes of EESA is to "help families keep their homes and to stabilize communities." 12 U.S.C. § 5213. The EESA mandates that the Secretary "shall implement a plan that seeks to maximize assistance for homeowners and use the authority of the Secretary to encourage the servicers of the underlying mortgages, considering net present value to the taxpayer" to take advantage of "available programs to minimize foreclosures." 12 U.S.C. § 5219.

40.     The EESA authorized the Secretary to establish the Troubled Asset Relief Program ("TARP") to purchase troubled assets from financial institutions. 12 U.S.C. § 5211. Congress allocated up to $700 billion to the Department of the Treasury for TARP. 12 U.S.C. § 5225.

41.     In February 2009, the Department of the Treasury created the Making Home Affordable Program ("MHA") under its authority under the EESA. One of the major initiatives under the MHA is the Home Affordable Modification Program ("HAMP").[5]

42.     The purpose of HAMP is to modify eligible mortgages to lower the monthly mortgage payments for homeowners in default or at risk of default.[6] HAMP sets forth a uniform structure for offering modified loans to qualifying borrowers.[7] The Obama Administration allocated $75 billion to HAMP, including $50 billion in TARP funds.[8]

---

[5] Office of the Special Inspector General for the Troubled Asset Relief Program, *Factors Affecting Implementation of the Home Affordable Modification Program*, March 25, 2010 ("SIGTARP Report"), at 1, *available at* http://www.sigtarp.gov/reports/audit/2010/Factors_Affecting_Implementation_of_t he_Home_Affordable_Modification_Program.pdf.

[6] *Id.*

[7] HAMP Supplemental Directive 9-01 ("SD 9-01") at 1. The HAMP "Program Documentation," which includes SD 9-01 and other supplemental instructions and directions to Servicers issued by the Treasury, Fannie Mae, and Freddie Mac is *available at* the HAMP Administrative Website for Servicers, https://www.hmpadmin.com/portal/index.jsp.

Specifically, the Handbook, 2009 Supplemental Directives, and 2010 Supplemental Directives, and archives are *available at*

43.     Participating mortgage servicers are largely responsible for executing HAMP. Servicers receive a $1,000 incentive from the federal government for each permanent modification they execute under HAMP.[9] This "incentive," however, is basically equivalent to the estimated cost to perform a single loan modification.

44.     The Federal National Mortgage Association ("Fannie Mae") and the Federal Loan Mortgage Corporation ("Freddie Mac") act as the government's Administrative Agent and Compliance Agent for HAMP.[10]

45.     Participating servicers enter into a Servicer Participation Agreement ("SPA") with the United States (through its agent, Fannie Mae).  As of January 2010, 110 servicers, including Citi, have entered into an SPA to participate in HAMP.[11] A signed copy of the SPA between Paul R. Ince, Citi's Chief Financial Officer, and Fannie Mae, dated April 13, 2009 is *available at* http://www.financialstability.gov/docs/HAMP/CitiMortgage%20Servicer%20Participation%20Agreement.pdf.

46.     A servicer's duties and responsibilities under HAMP are set forth in the SPA.  The SPA incorporates supplemental instructions and directions to Servicers issued by the Treasury, Fannie Mae, and Freddie Mac, referred to as

---

https://www.hmpadmin.com/portal/programs/guidance.jsp. HAMP checklists and NPV model documents are *available at* https://www.hmpadmin.com/portal/programs/servicer.jsp.

The FAQs are *available at* https://www.hmpadmin.com/portal/programs/servicer.jsp and https://www.hmpadmin.com/portal/programs/docs/hamp_servicer/hampconversion faqs.pdf.

[8] Office of the Special Inspector General for the Troubled Asset Relief Program, Quarterly Report to Congress, April 20, 2010 report at 8, *available at* http://www.sigtarp.gov/reports/congress/2010/April2010_Quarterly_Report_to_Congress.pdf.

[9] SD 09-01 at 22-25.

[10] SIGTARP Report, *supra* at 2.

[11] *Id*. at 10.

1   "Program Documentation."   Until recently, directions to servicers were issued
2   primarily in the form of "Supplemental Directives," regarding the servicer's duties.
3   Now, the HAMP rules are compiled in a "Handbook for Servicers of Non-GSE
4   Mortgages."   The Treasury also provides Frequently Asked Questions ("FAQ")
5   documents that clarify the Supplemental Directives for HAMP.[12]   Each servicer is
6   required to review these documents and the "frequently asked questions constitute
7   supplemental documentation that is included in, and shall be deemed part of, the
8   HAMP Program Documentation described in Section 1 of the SPA."[13]

9       47.   The SPA provides that the servicer *shall* perform the loan
10   modification and foreclosure prevention services described in the Program
11   Documentation.  SPA at ¶ 1A (emphasis in original).

12       48.   A homeowner is eligible for HAMP if she meets certain criteria.  The
13   borrower's mortgage must be delinquent or at risk of imminent default due to
14   changes in financial circumstances, such as unemployment.[14] [15]   The borrower
15   must have a monthly mortgage payment ratio of greater than 31 percent.   The
16   mortgage must have originated before January 1, 2009, be secured by a 1-4 unit
17   property (one of which is the borrower's principal residence), and fall within
18   HAMP's maximum unpaid principal balance requirements.[16]   The home may not
19   be investor-owned, vacant or condemned.   Borrowers in bankruptcy may be
20   considered for HAMP and borrowers engaged in litigation regarding their

21   [12] *See e.g.* Supplemental Documentation – Frequently Asked Questions, April 2,
22   2010 ("April FAQ").

23   [13] *Id.* at 1.

24   [14] Default is generally defined as being at least 60 days late on a mortgage
25   payment.

     [15] SD 9-01 at 2; *see also* SIGTARP Report, *supra* at 3.
26
     [16] In other words, duplexes or condominiums containing more than one unit, but
27   not to exceed four, also qualify for HAMP modification as long as one of the units
     is the borrower's principal residence.
28

mortgage also qualify.[17] All borrowers must sign a Hardship Affidavit that describes their reason for applying for a HAMP modification.

49. Pursuant to Supplemental Directive 09-01, "a borrower that is current or less than 60 days delinquent who contacts the servicer for a modification, and claims a hardship must be screened for imminent default."[18]

50. If a borrower is determined to be at risk of imminent default or is 60 days or more delinquent and the mortgage meets the HAMP requirements discussed above, the servicer *must* evaluate the loan to determine whether it qualifies for modification.[19]

51. First, the servicer must determine whether, by changing the interest rate, duration, or other terms of the loan in a particular sequence known as the "Standard Modification Waterfall," the borrower's total payment can be reduced to 31% of the borrower's monthly income.[20] By going through these steps, the servicer arrives at proposed modification terms.

52. Next, the servicer uses those terms to perform a "Net Present Value" ("NPV") test to determine whether the borrower's loan should be modified.[21] The NPV test determines whether it is economically advantageous to modify the loan. Factors considered under the NPV include the value of the mortgage, the homeowner's credit score, the home's location, the loan's delinquency status, and the homeowner's debt to income ratio.[22] The Treasury provided "Base Net Present

---

[17] SD 9-01 at 2; SIGTARP Report, *supra* at 4.

[18] SD 9-01 at 3-4.

[19] *Id.*; *see also* SPA at ¶ 1A.

[20] *Id.* at 8-10; HAMP Checklist at 6.

[21] *Id*; *see also* SPA at ¶ 1A.

[22] SIGTARP Report, *supra* at 4.

---

Value (NPV) Model Specifications" that servicers may use or customize (provided that the servicer's test conforms to HAMP requirements).[23]

53.     Servicers *must* offer a HAMP modification if the homeowner has a positive NPV, "which indicates that it is economically advantageous to modify the loan; *i.e.*, the modification will cause less loss to the owner of the mortgage than proceeding with foreclosure."[24]   If a borrower has a negative NPV, the servicer may perform the modification at its discretion.    Regardless of whether a modification is pursued, the servicer must maintain documentation.

54.     Once a borrower qualifies for loan modification, servicers must perform a two-step process for HAMP modifications.  First, the servicer provides the borrower with a Trial Period Plan ("TPP").[25]  The Trial Period Plan Agreement or Notice outlines the terms of the trial period.[26]  The Trial Period Plan and Notice promise that the servicer will permanently modify the loan if the borrower sends in requested income documentation and makes timely trial period payments.[27]

55.     The effective date of the trial period is set forth in the TPP Agreement or Notice.[28]  The borrower must be current under the terms of the TPP at the end of the trial period to receive a permanent modification.  If the borrower makes all

---

[23] Home Affordable Modification Program Base Net Present Value (NPV) Model Specifications.

[24] 09-02 at 4, 14-15; SIGTARP Report, *supra* at 4. *see also* NPV Model Specifications.

[25] At the inception of the program, the offer was in the form of a Trial Period Plan Agreement which borrowers signed and returned to accept.  After Supplemental Directive 09-07 was issued in October 2009, servicers were permitted to use either the TPP Agreement or a simple TPP Notice which offered the trial modification, which the borrower accepted by making the first payment under the plan.  After March 2010, servicers were required to use only the TPP Notice SD-09-06.  *See* SD-09-07, at 6-7, and Exs. C and D thereto.

[26] SD 9-01 at 14.

[27] *Id.* at 15, 17-18.

[28] *Id.*

1  required trial period payments no later than 30 days from the date the final

2  payment is due, then he or she is current.[29]

3       56.    If the borrower has provided the necessary documentation, signed the

4  TPP Agreement (where applicable), and made all the TPP monthly payments, then

5  Step 2 of HAMP is triggered and the borrower receives a permanent

6  modification.[30]

7       57.    HAMP directives mandate specific protections for borrowers applying

8  for modification under the program.  Servicers may not proceed with foreclosure

9  until the borrower has been evaluated for the program, and borrowers are protected

10  against foreclosure during the application process and trial period.[31]  Servicers

11  cannot force borrowers to waive their legal rights, or demand certain fees from

12  them.[32]  Servicers are required to give borrowers information so they can engage in

13  informed decision-making.[33]  After January 1, 2010, servicers were required to

14  give borrowers written explanations for denying a modification.[34]

15       58.    Finally, servicers are required to report a "full file" status report to

16  credit reporting agencies while they evaluate borrowers for eligibility during the

17  TPP.  "If the borrower is current when they enter the trial period, the servicer

18  should report the borrower as current but on a modified payment . . . ."[35]

19       59.    HAMP rules and directives create explicit rules and rigorous timelines

20  for the HAMP modification program.  The servicer's timing in processing

21

---

[29] *Id.*

22  [30] *Id.* at 18; *see also* April FAQ at 19.

23  [31] SD 09-01 at 14, 19; SD 10-02 at 4-7.

24  [32] SD 09-01 at 2, 22.

25  [33] SD 09-01 at 13.

26  [34] SD 09-07 at 7; SD 09-08 at 2-3.

27  [35] April FAQ at 20.

28

borrower requests and evaluating eligibility for a permanent modification is of the essence. HAMP rules require that servicers evaluate the income documentation submitted "upon receipt" – later clarified to within 30 days.[36] In all cases, HAMP rules direct servicers to prepare the permanent HAMP modification agreement early "to allow sufficient processing time for the modification to become effective on the first day of the month following the final trial period month."[37]

60. HAMP rules demand that servicers "comply with HAMP requirements" and "document the execution of loan evaluation, loan modification and accounting processes."[38] Servicers "must have adequate staffing, resources, and facilities for receiving and processing the HAMP documents and any requested information that is submitted by borrowers. Servicers must also have procedures and systems in place to be able to respond to inquiries and complaints about the HAMP."[39] Servicers must retain documents and keep detailed records.[40]

## CITI'S PARTICIPATION IN HAMP

61. Citi aggressively solicited its borrowers to apply for modifications under HAMP through various advertisements and representations, including mailers such as the one attached hereto as Exhibit F.

62. Citi's website proclaims "Citi is committed to helping our customers facing financial hardship remain in their homes," and states "[i]f you are facing financial hardship, we will work with you to find the best option for you." Citi heavily advertised its commitment to "Homeowner Assistance," assuring

---

[36] *Id.* at 5, 15 ("upon receipt"); SD 09-07 at 1 (after October 8, 2009, review within 30 days).

[37] SD 9-03.

[38] SD 9-01 at 25.

[39] *Id.* at 13.

[40] *Id.*

1   borrowers that Citi is committed to helping keep people in their homes, with

2   options available to lower monthly payments.

3       63.    Citi repeatedly touted its supposed intent and ability to help needy

4   homeowners.    For example, under "Homeowner Assistance" and "Hardship

5   Assistance," the Citi website states:

6          Citi is committed to helping keep people in their homes.  There are

7          many possible solutions to manage your mortgage payment, and the

8          most important step you can take is to reach out for help today. . . .

9          **Are you concerned about your ability to pay your bills?  Help Is**

10         **Free!** . . . Many homeowners are having trouble with their mortgage

11         payments and you may have the option to modify or change certain

12         parts of your mortgage loan agreement.  Sometimes altering the

13         interest rate, the term of the mortgage or even the mortgage product

14         may be able to help you manage your monthly payments. . . . . Citi

15         understands sometimes situations occur that make it difficult for you

16         to make your monthly mortgage payments.  Our Workable Solutions

17         Program was specifically created to help our customers who are

18         experiencing these hardships.  If you're facing foreclosure, you may

19         still be able to keep your home.  This requires you to be proactive and

20         work with your lender or servicer, or a professional counselor.

21      64.    Citi's "Homeowner Assistance" publicity campaign, including its

22   participation in HAMP, prompted thousands of customers to contact Citi and apply

23   for loan modifications.  Citi's advertising represents, explicitly and implicitly, that

24   Citi complies with HAMP requirements.  Treasury Service Performance Reports

25   estimate that, since HAMP started, hundreds of thousands of Citi borrowers were

26   potentially eligible for loan modification.

27

28

65.   In reality, Citi's participation in HAMP and related modification efforts are categorical failures. As of August 31, 2010, Citi initiated only 150,568 HAMP trials.[41]  As of that date, Citi had only 10,400 active trial modifications and made only 49,538 permanent loan modifications.

66.   These numbers reflect Citi's failure to process modifications in time or according to HAMP rules. Citi regularly extends the trial period far beyond the 90-day HAMP guideline, erroneously denies permanent loan modifications to qualified borrowers, inaccurately represents that borrowers will suffer no adverse credit consequences during the trial period, and even places some borrowers in incorrect programs that cannot result in permanent loan modifications.

67.   Citi also fails to employ an adequate number of properly-trained employees to handle the large volume of loan modification requests.[42]  Citi hired personnel with minimal education and/or no prior mortgage-related experience and provided a token "training" program that did not prepare those employees for processing incoming loan modification requests in an accurate, timely manner.

68.   Homeowners have complained about Citi's lack of customer service and poor communication.   For instance, customers complain that despite submitting all of the documentation that Citi requests for a loan modification, Citi claims that the documentation is missing and/or Citi claims it did not receive the documentation, and makes repeated demands for it.  Many borrowers complain they cannot get through to Citi to initiate the loan modification process.

69.   Citi's slow processing of HAMP applications substantially extends the time period that a loan is considered delinquent, damaging the borrower's credit.

---

[41] Servicer Performance Report Through August, 2010, *available at* http://www.financialstability.gov/docs/Sept%20MHA%20Public%202010.pdf.

[42] *See* Rebecca Christie and Bradley Keoun, *Treasure May Begin Selling Citigroup Shares Today (Update1)*, April 26, 2010, *available at* www.bloomberg.com/apps/news?sid=aAnWrmkWn2Tk&pid=20601087.

70.   When borrowers apply for a modification, they are not adequately informed that their loans will be reported as delinquent even if they make timely modification payments.  In its third quarter earnings report released on October 15, 2009, Citigroup stated that it "[c]ompleted more than 24,000 mortgage loan modifications during the quarter.  In addition, at the end of the quarter, Citigroup had more than 63,000 loans in the trial modification period under the [HAMP]."  The earnings report further stated (although this was not revealed to Class members) that "[l]oans in the trial modification period under the HAMP *continue to remain delinquent even if the reduced payments agreed to under the program are made by the borrower* . . . [t]he impact of the HAMP also contributed to the $2.0 billion sequential *increase in loans 90+ days past due* in the North America residential real estate lending business" (emphasis added).   Citigroup's first mortgage delinquencies went from $10.2 billion in the second quarter of 2009 to $12.5 billion in the third quarter.

71.   Even if a borrower manages to start the TPP process and comply with its terms, Citi fails to convert TPP Agreements into permanent modifications and/or delays determining a customer's status for permanent modification.  Class members' trial periods have extended far beyond the 90-day HAMP guideline – sometimes up to 180 days, 270 days or more.  Only a small fraction of loan modification applicants complete their trial periods within the 90-day HAMP guideline.

72.   The consequences to the borrower are severe: the borrower's unpaid balance continues to rise because Citi adds the difference between the trial payment and regular payment to the arrearage.  The higher balance makes it harder for the borrower to sell the home, complete a short sale, or repay the arrearage, whether through a repayment plan or Chapter 13 bankruptcy.  The large arrearage

1 │ amount can make it more difficult for the borrower to qualify for a non-HAMP or

2 │ "traditional" loan modification.

3 │       73.     Whenever Citi denies a permanent modification and/or delays making

4 │ a decision, it nevertheless generates profits because it assesses a large amount of

5 │ fees for default management against its customers, such as late fees, inspection

6 │ fees and other fees. For example, many customers are charged monthly property

7 │ inspection fees that are automatically scheduled, are forced to pay for forced

8 │ insurance from affiliated businesses, and/or are required to pay other unnecessary

9 │ and unreasonable "delinquency" expenses.

10 │       74.     In addition, without informing borrowers whether they have been

11 │ denied a permanent loan modification, Citi sends borrowers default letters

12 │ demanding thousands of dollars and threatening foreclosure. Citi fails to inform

13 │ borrowers entering trial plans that thousands of dollars will suddenly become due

14 │ if their modification is denied. Homeowners paying under trial plans are, by

15 │ definition, already facing financial hardship. Citi's demand for the arrearage

16 │ amount effectively guarantees that the borrower will be unable to pay, or forces

17 │ them into short-term repayment plans to avoid foreclosure.

18 │       75.     The arrears Citi demands include several "junk fees," i.e.,

19 │ unnecessary, unreasonable foreclosure-related fees, including automatically-

20 │ imposed computerized inspection fees which are illegitimate given that borrowers

21 │ are making timely payments under the trial modification plans.

22 │       76.     Citi also reports incomplete and/or inaccurate information to credit

23 │ reporting agencies about borrowers who are under a TPP. Citi reports consumer

24 │ loans as delinquent to credit reporting agencies even if trial payments are made on

25 │ time and even if a borrower was current at the time the borrower entered a TPP.

26 │ Under HAMP, if a borrower is current at the time he or she enters a TPP, Citi

27 │ should report the borrower as current but on a payment plan. Similarly, if a

28 │

borrower is late at the time he or she enters a TPP, but current for the duration of the TPP, Citi should report the borrower as delinquent for the duration the borrower was delinquent, but report the borrower as current during the TPP but on a payment plan. Instead, Citi has a uniform written policy of reporting borrowers delinquent, even if they are current during the TPP. Citi fails to comply with HAMP's credit reporting guidelines, despite its representations that its loan modification programs comply with HAMP. Notwithstanding HAMP's requirements, Citi's credit reporting policies result in incomplete and/or inaccurate information being reported to credit reporting agencies.

77. By failing to convert TPP Agreements into permanent modifications and/or failing to make any determination *at all* after a customer's completion of the three-month (or longer) trial period, Citi generates profits at the expense of borrowers who are left questioning whether their homes can be saved.

78. Citi's deficient implementation of the HAMP program increases its own profits at the borrower's expense. A borrower's indebtedness increases, rather than decreases. The likelihood of foreclosure also increases because many borrowers cannot pay the massive arrearages created by Citi's delayed loan modification process and the repeated assessment of fees to their accounts.

79. Citi's conduct also prevents borrowers from pursuing other courses of action. For example, money that homeowners are putting towards their TPP payments could be used instead to pursue bankruptcy, help them relocate, or proceed with a short sale of their home. Citi's undisclosed policy of reporting TPP payments as a rolling delinquency deprives borrowers of many alternative living arrangements or, at the very least, makes them more costly. Citi's policies and practices place borrowers in a worse position than if they had never applied for a HAMP loan modification.

### THE PLAINTIFFS' EXPERIENCE

**Plaintiffs King and Glennon**

80.    In April 2009, in response to financial difficulties, Plaintiffs King and Glennon contacted Citi and inquired about a loan modification to reduce their $2,186.82 mortgage payment.

81.    King and Glennon submitted a hardship assistance package and complied with Citi's requests for additional – sometimes duplicate – documentation. King and Glennon continued to make timely loan payments.

82.    In July 2009, Defendant approved King and Glennon's request for repayment and required four $2,186.82 payments between July and October 2009.

83.    Beverly King called Citi to explain that the $2,186.82 repayment amount was not a reduced payment. Citi told King that this was an error and that Defendant would send a new letter reflecting a reduced payment schedule.

84.    In August 2009, Citi approved King and Glennon's reduced payment plan and required four payments of $1,094 between September and December 2009. The repayment schedule referenced a January 2010 payment of $11,401, but does not explain what that figure represents.

85.    King contacted Citi about the $11,401 January 2010 payment, and a Citi representative told her "don't worry" and that Citi would "extend" that payment in February 2010 if King and Glennon made all the other payments on time. Plaintiffs King and Glennon accepted this "modification" offer and made the requested payments starting in September 2009.

86.    King and Glennon timely submitted each of the modified payments as required under their agreement with Defendant.

87.    Despite complying with Defendant's instructions, in February 2010 Citi demanded $13,591, which included the $11,401 payment and late and delinquent fees – including $353.39 in late charges and $117 in delinquency expenses. Defendant told Plaintiffs that if they must make the enormous payment

1   immediately or face a short-sale of their home or foreclosure.  Defendant did not

2   "extend" the massive balloon payment.

3       88.    On information and belief, Plaintiffs allege that despite King and

4   Glennon's repeated written requests to permanently modify their mortgage terms

5   to achieve an affordable payment, King and Glennon were placed in a "repayment

6   plan" that provided several months of reduced mortgage payments followed by a

7   $11,401 balloon payment in January 2010, and was designed to bring King and

8   Glennon current on their loan, rather than modifying their loan.  Plaintiffs King

9   and Glennon did not request or want this option, and Citi did not inform them that

10  it imposed this option upon them.

11      89.    Defendant reported King and Glennon to credit reporting agencies as

12  late or in default, which destroyed their credit rating.

13  **Plaintiff Bernard**

14      90.    In August 2009, in response to financial difficulties, Plaintiff Bernard

15  contacted Citi to inquire about her eligibility for a HAMP loan modification.

16      91.    In August 2009, Citi determined that Bernard was eligible for a

17  HAMP loan modification.  Citi informed Bernard that it would reduce her monthly

18  payment from $2,015.10 to $1,457.02 and instructed her to begin paying the

19  reduced amount immediately under a three-month TPP.

20      92.    Bernard made her first TPP payment in September 2009.  Shortly

21  thereafter, she received an offer to enter into a three month HAMP TPP.

22      93.    The TPP offer letter states, "If you qualify under the federal

23  government's Home Affordable Modification program and comply with the terms

24  of this Trial Period Plan, we will modify your mortgage loan and you can avoid

25  foreclosure."  The letter states that signing the TPP Agreement, returning it along

26  with certain verification documents, and providing the timely modified payment

27

28

1  constitutes acceptance of the offer.  A copy of the TPP Agreement itself is attached
2  as Exhibit A.

3      94.    The TPP Agreement provided that Bernard should make three trial
4  period payments of $1,457.02.

5      95.    Bernard accepted the above offer by signing the TPP Agreement,
6  sending in the first modified payment, and submitting the requested documents.

7      96.    Bernard timely made both of her remaining TPP payments.

8      97.    Despite Bernard's compliance with the terms of the TPP agreement,
9  to date Bernard has not been offered a permanent HAMP loan modification.  Citi
10  has not informed her in writing whether her loan will be permanently modified.

11      98.    Bernard contacted Citi repeatedly to inquire about the status of her
12  modification.  Citi instructed her to continue making monthly payments of
13  $1,457.02.  Bernard complied with these instructions.

14      99.    In mid-December 2009, Citi began sending Bernard delinquency
15  notices regarding her loan.  Bernard contacted Citi regarding the notices.  Citi
16  instructed her to ignore the notices, and explained that she received them because
17  Citi's computer records did not reflect her HAMP modification process.

18      100.   In 2010, Bernard complied with Citi's requests for additional –
19  sometimes duplicate – verification documents.

20      101.   Despite complying with Defendant's instructions, in April 2010, Citi
21  threatened to commence foreclosure proceedings if Bernard did not pay $13,766
22  within three weeks.  This figure includes approximately $100 in monthly
23  inspection fees, as well as a number of other unknown "delinquency related" fees.

24      102.   Citi had no valid reason to repeatedly inspect the property.  Bernard
25  was current on her monthly payments and the initial inspection should have
26  revealed that the property was occupied and in good condition.

27
28

103.   Bernard contacted Citi to complain that she had fulfilled all the terms of the TPP Agreement.  Citi informed her that it was investigating the matter, and would suspend all foreclosure proceedings while the investigation was pending, yet continued to send foreclosure threats to Bernard during the "investigation."

104.   In May 2010, with the threatened foreclosure date just days away, Citi advised Bernard that the only way to avoid foreclosure was to enter into a "repayment plan."  Under the repayment plan Bernard would pay $2,015.10 per month for five months and a $14,329.90 "balloon payment".

105.   Citi also demanded that Bernard pay for forced insurance and property taxes through Citi.  Bernard previously paid her taxes and insurance on her own for $5,286 per year.  Under Citi's new plan Bernard pays Citi $8,777.88 per year for forced insurance and taxes.

106.   After her ordeal with Citi, Bernard felt that entering the repayment plan was her only option and she entered the repayment plan.

107.   Despite Bernard's never missing a mortgage payment, Citi reported her loan as "delinquent" for months to consumer credit reporting agencies, causing her credit score to drop from 800 to 619.

108.   Bernard sacrificed time, money, and other alternatives to loan modification in complying with all of the terms in the TPP Agreement, in reliance on Citi's promises that compliance would result in a permanent HAMP loan modification.

**Plaintiffs Chui and Verdini**

109.   In April 2009, in response to financial difficulties, Plaintiffs Chui and Verdini contacted Citi to inquire about their eligibility for a HAMP loan modification.

110.   In June 2009, Chui and Verdini received paperwork relating to their application for a HAMP loan modification, including an offer for them to enter into a three-month HAMP TPP.

111.   The TPP offer letter states, "If you qualify under the federal government's Home Affordable Modification program and comply with the terms of this Trial Period Plan, we will modify your mortgage loan and you can avoid foreclosure."   The letter further states that signing the TPP Agreement, returning it along with certain verification documents, and providing the timely modified payment will constitute acceptance of the offer.   A copy of the TPP Agreement itself is attached as Exhibit B.

112.   The TPP Agreement provided that Chui and Verdini should make three trial period payments of $2,064.33.

113.   Chui and Verdini accepted the above offer in June 2009 by signing the TPP Agreement, sending in the first modified payment, and submitting the requested documents.

114.   Chui and Verdini timely made both of their remaining TPP payments.

115.   Despite their compliance in all respects with the terms of the TPP agreement, to date Chui and Verdini have not been offered a permanent loan modification under HAMP.   Citi has not informed them in writing whether their loan will be permanently modified under HAMP.

116.   Chui and Verdini contacted Citi repeatedly to inquire about the status of their modification.   Citi instructed them to continue making monthly payments of $2,064.33.   Chui and Verdini complied with these instructions.

117.   Chui and Verdini complied with Citi's requests for additional – sometimes duplicate – verification documents.

118.   In December 2009, Citi began sending Chui and Verdini delinquency notices regarding their loan.   Chui and Verdini contacted Citi regarding the notices.

Citi never gave them consistent answers regarding why they received the notices. One time, they were told that they had too much equity on her house; another time they were told that Citi had seen that their house was for sale (which it was not).

119.  In December 2009, Citi threatened to commence foreclosure proceedings on their home if Chui and Verdini did not pay $9,283.17 within one month.  This figure includes approximately $45 in monthly inspection fees as well as a number of other unknown "delinquency related" fees.    While a single inspection fee of $15 may be minor in an individual case, the combined revenue generated by these inspection fees is staggering.

120.  Citi has no valid reason to repeatedly inspect the property.  Chui and Verdini were current on their monthly payments and the initial inspection should have revealed that the property was occupied and in good condition.

121.  In early February 2010, after borrowing money from Chui's father, Chui and Verdini called Citi to pay the $15,533 that Citi told them was now due. Citi told them that they had been sent directly to foreclosure.  This phone call was the first time Chui and Verdini were told that Citi had initiated foreclosure proceedings.

122.  Chui and Verdini explained to Citi that they had fulfilled all the terms of the TPP Agreement.  Citi told them that their case was being handled by an outside attorney and refused to give Chui and Verdini any additional information regarding their HAMP loan or the foreclosure proceeding.

123.  Chui and Verdini felt they had no choice but to immediately hire their own attorney in order to obtain reinstatement figures from Citi.  After weeks of attempting to contact Citi and/or its attorney, Chui and Verdini finally received an email telling them that they needed to pay a reinstatement amount of $24,455.33. This amount included numerous property inspection fees, attorneys' fees, court fees, and a $750 mediation fee even though they had not gone to mediation.

| CONSOLIDATED CLASS ACTION COMPLAINT | - 27 - | CASE NO.: CV 10-03792 DSF (PLAx) |

124.   Chui and Verdini paid the reinstatement amount.  Several weeks after their payment, Citi dismissed its foreclosure complaint without prejudice.

125.   Despite Chui and Verdini never missing a payment, Citi reported their loan as delinquent and "adverse" for months to consumer credit reporting agencies, causing their credit score to drop by 150 points.

126.   Chui and Verdini sacrificed time and money complying with all of the terms in the TPP Agreement and fighting foreclosure, in reliance on Citi's promises that their compliance would result in a permanent HAMP loan modification.

**Plaintiff Daniel**

127.   In July 2009, in response to financial difficulties, Plaintiff Daniel contacted Citi in July 2009 to inquire about her eligibility for a HAMP loan modification.

128.   In September 2009, Ms. Daniel was offered a three-month TPP Agreement.  Daniel accepted the offer by signing the TPP Agreement, sending in the first modified payment of $1,251.56, and submitting the requested verification documents.

129.   Daniel timely made both of her remaining TPP payments.

130.   Despite Daniel's compliance in all respects with the terms of the TPP agreement, Daniel has not been offered a permanent loan modification to date under HAMP.  Citi has not informed her in writing whether her loan would be permanently modified under HAMP.

131.   Daniel contacted Citi repeatedly to inquire about the status of her modification.  Citi instructed her to continue making $1,251.56 monthly payments. Daniel complied with these instructions.

132.   At some point in time, Citi began sending Daniel delinquency notices, which include the addition of unidentified fees, regarding her loan.   Daniel

1   contacted Citi regarding the notices.  Citi instructed her to ignore the notices and to

2   continue to make the monthly payments.

3         133.  Daniel complied with Citi's requests for additional – sometimes

4   duplicate – verification documents.

5         134.  In May 2010, without informing Daniel about the status of her HAMP

6   application, Citi sent Ms. Daniel a purported "Modification Agreement."   The

7   Modification  Agreement  stated  that  Daniel's  new  principal  balance  was

8   $226,715.66.   The  amount  included  "arrearages"  and  is  larger  than  Daniel's

9   original  loan  amount.   It  is  unclear  how  Citi  determined  the  Modification

10  Agreement's terms, and Citi refused to explain its calculations to Daniel.   The

11  Modification  Agreement  gave  Daniel  until  May  19,  2010  to  accept  the  offer.   A

12  copy of the Modification Agreement is attached as Exhibit C.

13        135.  Under the Modification Agreement the monthly principal and interest

14  payment is $1,675.80 for the  first two years,  $1,820.62 for  the  third year, and

15  $1,911.27 thereafter.  Daniel will also be charged an additional monthly escrow

16  payment amount, which may "adjust periodically" (initially $85.98 per month for

17  the first two years).

18        136.  Daniel called Citi to inquire about the Modification Agreement and

19  was told that she could either (a) accept it and pay back interest, or (b) be placed in

20  default – implicitly threatening foreclosure.   Consequently, Daniel  believed

21  entering into the "Modified Agreement" was her only option.

22        137.  Despite Daniel's never missing a payment on her mortgage loan, Citi

23  reported Daniel's loan as "partial" and "derogatory" for months to credit reporting

24  agencies, causing her credit score to drop from 650 to 590.

25        138.  Daniel sacrificed time and money complying with all of the terms in

26  the TPP Agreement, in reliance on Citi's promises that her compliance would

27  result in a permanent HAMP loan modification.

28

---

**Plaintiffs Maria and Pedro Betancourt**

139.   In November 2008, in response to financial difficulties, Plaintiffs Maria and Pedro Betancourt contacted Citi to inquire about their eligibility for a HAMP loan modification.

140.   In June, 2009, Citi informed the Betancourts that they were approved for a HAMP trial plan, and sent them a Home Affordable Modification Trial Period Plan contract.  A copy of the TPP Agreement is attached as Exhibit E.

141.   The TPP Agreement provided that the Betancourts should make three trial period payments of $2,275.40.

142.   In July 2009, the Betancourts accepted the above offer by signing the TPP Agreement, timely making the first modified payment, and submitting the requested verification documents.

143.   The Betancourts timely made both of their remaining TPP payments.

144.   Despite the Betancourts' compliance in all respects with the terms of the TPP agreement, to date they have not been offered a permanent loan modification under HAMP.  Citi has not informed them in writing whether their loan will be permanently modified under HAMP.

145.   Citi did not offer the Betancourts a permanent modification at the end of the Trial Period.  Ms. Betancourt contacted Citi in October 2009 to inquire about the status of her modification, and a Citi representative told her to continue making trial period payments.  The Betancourts complied with these instructions.

146.   In January 2010, Citi informed the Betancourts that they were approved for a permanent modification and should receive documentation soon. Since the Betancourt had made seven monthly payments on what was supposed to be a three month trial period, Ms. Betancourt told the Citi representative that she was going to stop making payments and would wait until she received the final modification papers to make another payment.

147. The Betancourts complied with Citi's requests for additional – sometimes duplicate – verification documents.

148. In February 2010, a Citi representative notified the Betancourts that Citi could not locate the modification, and that it would be resent.

149. In March 2010, Citi sent the Betancourts a "Citi Affordable Modification." The cover letter demanded that the Betancourts sign and return the modification agreement "within 24–48hrs of receipt."

150. Although the "Citi Affordable Modification" agreement used a format similar to HAMP modification agreements, it is not a HAMP modification. It was fixed at 2% for the first two years, and then stepped up to 6.25% over the next 5 years. The term was extended to 34 years. A permanent modification under HAMP would have a lower interest rate for five years, then an increased rate every year until it fixed at the Freddie Mac Survey Rate at the date of the modification – in March 2010, around 5%.

151. In April 1, 2010, Citi sent the Betancourts a letter congratulating them for entering a trial plan, and two more copies of the June 2009 HAMP trial period plan contract that they had already executed and returned.

152. On April 12, 2010, a Citi representative who told Ms. Betancourt that the family did not qualify for a HAMP modification because their income was too high.

153. Despite their compliance in all respects with the terms of the TPP Agreement, the Betancourts were never offered a HAMP final modification – nor did they ever receive a letter stating the reason they had been denied a modification.

154. Citi has reported this account to at least one credit agency as "180 days past due" from April 2009 to May 2010.

## CLASS ALLEGATIONS

155.   Plaintiffs bring this action pursuant to Rule 23 of the Federal Rules of Civil Procedure.  The "Class" is defined as follows:

(a)   All California and Florida residents with mortgage loans serviced by Citi and who, since April 13, 2009 through the final disposition of this and all related actions, (a) requested a mortgage loan modification from Citi, (b) made reduced and timely mortgage payments as instructed by Citi and complied with Citi's requests for documentation, (c) but who have not yet received a permanent modification, or have been notified by Citi that their request is denied.

(b)   All California and Florida residents with mortgage loans serviced by Citi who, since April 13, 2009 through the final disposition of this and all related actions, (a) requested a mortgage loan modification from Citi, (b) made reduced and timely mortgage payments as instructed by Citi and complied with Citi's requests for documentation, (c) but were charged for various foreclosure-related fees (the "Junk Fee Class").

(c)   All California and Florida residents with mortgage loans serviced by Citi who, since April 13, 2009 through the final disposition of this and all related actions, (a) requested a mortgage loan modification from Citi, (b) made reduced and timely mortgage payments as instructed by Citi and complied with Citi's requests for documentation, (c) but were reported to credit reporting agencies as delinquent during the Trial Period Plan ("Credit Reporting Class").

156.   Plaintiffs reserve the right to modify or amend the Class definition(s) before the Court determines whether certification is appropriate.

157.   Plaintiffs and Class members are so numerous that joinder of all members individually, in one action or otherwise, is impractical.

| CONSOLIDATED CLASS ACTION COMPLAINT | - 32 - | CASE NO.: CV 10-03792 DSF (PLAx) |
|---|---|---|

DOCS\535125v4

158. This action involves common questions of law and fact, including:

(a) Whether Defendant breached its promises and contracts to permanently modify loans under HAMP and other loan modification or loss mitigation programs;

(b) Whether Defendant breached the implied covenant of good faith and fair dealing inherent in those contracts;

(c) Whether Defendant should be required under the doctrine of promissory estoppel to offer permanent modifications to Class members;

(d) Whether Defendant breached Plaintiffs' deeds of trust;

(e) Whether Defendants violated California Civil Code section 1788;

(f) Whether Defendants violated California Civil Code section 1785.25(a);

(g) Whether Defendants violated Florida Statute section 501.201;

(h) Whether Defendant violated California Business and Professions Code Section 17500;

(i) Whether Defendant violated California Business and Professions Code Section 17200;

(j) Whether Plaintiffs are entitled to declaratory and injunctive relief; and

(k) Whether Plaintiffs and Class members are entitled to damages, restitution, declaratory and/or injunctive relief as a result of Defendant's conduct; and, if so, the proper amount and nature of such relief.

159. Plaintiffs understand and are willing to undertake the responsibilities of acting in a representative capacity on behalf of the proposed Class. Plaintiffs will fairly and adequately protect the interests of the Class and have no interests that directly conflict with the interests of the Class. Plaintiffs have retained

1 counsel experienced in complex class litigation, and will prosecute this action
2 vigorously.

3     160. Plaintiffs' claims are typical of the claims of the Class because they
4 all have been deceived and damaged by Defendant's misconduct and breach.

5     161. Judicial determination of the common legal and factual issues in this
6 case would be far more efficient and economical as a class action than individual
7 determinations.

8     162. Plaintiffs know of no difficulty that will be encountered in the
9 management of this litigation that would preclude its maintenance as a class action.

10 **COUNT I**<br>**Breach of Contract (TPP Agreements and Notices)**<br>**(By All Plaintiffs Against Defendant)**
11

12     163. Plaintiffs incorporate the above allegations by reference as though
13 fully set forth herein.

14     164. Plaintiffs held mortgages serviced through Citi.

15     165. Plaintiffs sought permanent loan modifications through Citi's
16 advertised loan modification programs, as described above. Plaintiffs timely
17 provided all the necessary documentation requested by Citi in a timely manner in
18 order to participate in a modification program.

19     166. Citi's trial modification agreements and/or notices offered Plaintiffs
20 and Class Members a permanent loan modification in return for making timely trial
21 period payments and complying with Citi's documentation requests.

22     167. Plaintiffs agreed to Citi's offer and made timely reduced payments
23 consistent with Citi's instructions, and complied with all documentation requests,
24 or are excused from performance.

25     168. Citi accepted Plaintiffs' modified reduced payments throughout the
26 trial period.

27

28

CONSOLIDATED CLASS ACTION COMPLAINT     - 34 -     CASE NO.: CV 10-03792 DSF (PLAx)
DOCS\535125v4

169.   Plaintiffs' modified trial period payments as well as additional performance, including compliance with documentation requests, constitute consideration.  By making those payments Plaintiffs also gave up their ability to pursue other alternatives to prevent default and foreclosure, and other alternative living arrangements.

170.   Plaintiffs and Citi therefore formed valid contracts to modify their mortgage loans.

171.   Citi breached the terms of the trial modification agreements.  Citi systematically delayed and obstructed converting the trial modifications into permanent modifications by, among other things, demanding burdensome, duplicative documentation, failing to provide adequately trained loan modification staff and other failures described above.

172.   Defendant has denied or failed to approve Plaintiffs for permanent modifications and instead demanded balloon payments, late and default fees, in violation of the modification contracts.

173.   Plaintiffs remain ready, willing and able to perform under the loan modification contracts by continuing to make their modified reduced payments.

174.   As a direct and proximate result of Defendant's breach of the loan modification agreements, Plaintiffs did not receive the benefit of their bargain, were damaged, and are threatened with additional harm, in an amount to be determined at trial.

**COUNT II**
**Breach of Contract (Deeds of Trust)**
**(By Plaintiffs Bernard, Daniel, Chui and Verdini**
**On Behalf of the Junk Fee Class Against Defendant)**

175.   Plaintiffs incorporate the above allegations by reference as though fully set forth herein.

176. Plaintiffs Bernard, Daniel, Chui and Verdini, and other Class Members, have mortgage loans serviced by Citi and secured by Deeds of Trust (the "Junk Fee Class").

177. Plaintiffs and the Class members fully performed all conditions, covenants and promises required of them under their respective Deeds of Trust and as modified by Defendant in the TPP, including making timely mortgage payments before entering into the TPP, and making timely modified TPP payments.

178. After Plaintiffs were approved for a TPP, Defendant charged them various fees, including, but not limited to, repeated "inspection fees." On information and belief, the work orders for Citi's inspection fees are computer-generated requests which are assessed as a matter of course and do not provide any meaningful information to Citi.

179. The Deeds of Trust, however, only allow Citi to make "reasonable" inspections of the property.

180. Plaintiffs made timely monthly mortgage payments and occupied their homes at all relevant times. On information and belief, the initial inspection revealed that Plaintiffs' properties were occupied and in good condition and therefore, multiple inspections after the initial inspection were unreasonable.

181. As such, Citi's multiple property inspections – and the associated fees – breached the Deeds of Trust.

182. As a proximate result of Citi's breach of the Deeds of Trust, the Plaintiffs and Class members of the Junk Fee Class were damaged in an amount to be proven at trial.

## COUNT III
### Breach of the Implied Covenant of Good Faith and Fair Dealing
### (By All Plaintiffs Against Defendant)

183. Plaintiffs incorporate the above allegations by reference as though fully set forth herein.

184. Every contract imposes upon each party a duty of good faith and fair dealing in its performance, which requires that neither party do anything to infringe upon the other party's rights to the benefits of the agreement, or to deprive the other party of the contract's benefits.

185. Citi breached the implied covenants of good faith and fair dealing contained its trial modification agreements and the deeds of trust which Citi services, as alleged above.

186. Citi also breached an implied contractual term requiring it to offer permanent modifications within a reasonable time following the 90-day trial modification period.

187. Citi breached the implied covenant by, among other things:

(a)    failing to make good faith efforts to fulfill their contractual obligations, written and implied promises, and loan servicing functions;

(b)    failing to make good faith efforts to provide Plaintiffs with a permanent loan modification;

(c)    making false and/or misleading representations that Plaintiffs were eligible for the trial modification period, which would lead to a permanent loan modification;

(d)    billing borrowers for unreasonable and unnecessary fees, including, but not limited to, inspection fees;

(e)    failing to disclose that Plaintiffs modified reduced payments would be reported to credit bureaus as delinquent;

(f)    delaying processing, demanding duplicate documentation, and failing to provide Plaintiffs with adequate information regarding loan modification programs;

(g)    failing to provide enough adequately-trained personnel to ensure that loan modification applications were accurately or timely processed; and

(h)   demanding exorbitant balloon payments, late fees, and delinquency fees from Plaintiffs that neither they, nor any other Class Member, could reasonably be in a position to pay.

188.   As a direct result of Defendant's breaches of the implied covenant of good faith and fair dealing, Plaintiffs and Class Members were damaged, in an amount to be determined at trial.

**COUNT IV**
**Promissory Estoppel**
**(By All Plaintiffs Against Defendant)**

189.   Plaintiffs incorporate the above allegations by reference as though fully set forth herein.

190.   Citi represented that Plaintiffs and Class Members were eligible for trial loan modifications and could immediately make modified payments that would satisfy existing loan obligations and lead to permanent loan modifications.

191.   Citi intended to induce Plaintiffs and Class Members to rely on its representations regarding its loan modification programs and make modified payments.

192.   Plaintiffs and Class Members did rely on Citi's representations about its loan modification programs and began making modified payments.

193.   Plaintiffs' reliance was reasonable in light of Citi's representations regarding its loan modification programs.

194.   Plaintiffs relied on Citi's misrepresentations to their detriment.  Citi reported Plaintiffs to credit agencies as delinquent for paying the modified amount that Citi asked them to pay, damaging their credit.  Citi unreasonably demanded Plaintiffs make large balloon payments they afford.   Citi also refused to permanently modify Plaintiffs' loans, and Plaintiffs have lost the opportunity to seek alternatives to prevent the default and avoid foreclosure.

195. Citi also breached an implied contractual term by failing to offer permanent modifications within a reasonable time following the 90-day trial modification period.

**COUNT V**
**Violation of Civ. Code § 1788 *et seq.***
**(By Plaintiffs King, Glennon, Bernard and the Betancourts**
**Against Defendant)**

196. Plaintiffs incorporate the above allegations by reference as though fully set forth herein.

197. Citi is a "debt collector" within the meaning of Cal. Civil Code § 1788.2(c). The monies allegedly owed by the members of the proposed classes are "debts" within the meaning of Cal. Civil Code § 1788.2(d).

198. California's Rosenthal Fair Debt Collection Practices Act, Cal. Civ. Code § 1788 *et seq.* ("Rosenthal Act"), incorporates by reference, and requires compliance with, the provisions of the federal Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et. seq.* Cal. Civ. Code § 1788.17.

199. Citi violated these laws through various acts and practice including, but not limited to:

(a) using false, deceptive, or misleading representations or means in connection with the collection of any debt, 15 U.S.C. § 1692e;

(b) using false representations or deceptive means to collect or attempt to collect on any debt, 15 U.S.C. § 1692e(10); and

(c) using unfair or unconscionable means to collect or attempt to collect any debt, 15 U.S.C. § 1692f.

200. Under California Civil Code §§ 1788.30 and 1788.17, Plaintiffs and Class Members are entitled to recover actual damages sustained as a result of Citi's Rosenthal Act violations, in an amount to be proven at trial.

201. Under California Civil Code §§ 1788.30 and 1788.17, Plaintiffs and Class Members are entitled to recover attorney's fees, costs, and expenses.

## COUNT VI
### Violation of Cal. Civ. Code § 1785.25(a)
### (By Plaintiff Bernard On Behalf of the Credit Reporting Class Against Defendant)

202. Plaintiffs incorporate the above allegations by reference as though fully set forth herein.

203. The Consumer Credit Reporting Agencies Act ("CCRAA") prohibits persons from furnishing information on specific transactions "to any consumer credit reporting agency if the person knows or should know the information is incomplete or inaccurate."

204. Citi's standard policy and practice during trial periods is to "report [consumer loans] as delinquent to the credit reporting agencies" even if trial payments are made on time and even if a borrower was current at the time the borrower entered a trial payment plan.

205. Plaintiff and Class Members were current on their mortgage payments when they entered a TPP and made timely modified mortgage payments during the TPP. Citi should have reported those accounts to credit reporting agencies as current, but on a modified payment plan.

206. Citi, however, reported Plaintiff's reduced mortgage payments as delinquent to credit reporting agencies without indicating that her payments were timely a modified payment plan.

207. In doing so, Citi furnished information it knew or should have known was incomplete or inaccurate to credit reporting agencies in violation of Civil Code § 1785.25(a).

208. Plaintiff and Class Members who were current when they entered trial modifications suffered actual injury, including, but not limited to, damage to their credit scores, a loss of available credit, and increased cost of credit.

209.  Plaintiffs and Class members seek to recover actual damages in an amount to be determined at trial, injunctive and equitable relief, the costs of the action and attorneys' fees under Civil Code § 1785.31.

**COUNT VII**
**For Violation of Florida Statute §§ 501.201 *et seq.***
**(By Plaintiffs Chui, Verdini and Daniel Against Defendant)**

210.  Plaintiffs incorporate the above allegations by reference as though fully set forth herein.

211.  The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201 *et seq.*, prohibits deceptive and unfair trade practices.

212.  Citi's acts and practices, alleged herein, constitute unfair and deceptive trade practices under the FDUTPA.

213.  Citi's conduct is unfair and deceptive because it is contrary to its own representations that it complies with HAMP requirements.

214.  Citi's conduct is unfair because it offends established public policy and is immoral unethical, oppressive, unscrupulous, and substantially injurious to consumers.

215.  Citi's conduct is deceptive because it is likely to mislead consumers. For example, the TPP Agreement misleads borrowers into thinking that making timely modified payments during the trial period will result in a permanent loan modification.

216.  Citi's unfair and deceptive trade practices include the following:

(a)  representing that Plaintiffs and Class Members were applying for and being evaluated for HAMP modifications consistent with HAMP requirements, and failing to comply with HAMP requirements;

(b)  making false and misleading representations that trial modification periods would lead to permanent modifications if Plaintiffs and Class

1  Members made timely modified payment and complied with documentation

2  requests;

3          (c)     failing to determine it Plaintiffs and Class Members are eligible

4  for HAMP before putting them into HAMP TPPs;

5          (d)     failing to timely determine qualification for permanent HAMP

6  modification upon receipt of a borrower's first TPP payment and verification

7  documents or before the end of the three-month trial period;

8          (e)     failing to provide Plaintiffs with adequate information

9  regarding its loan modification programs;

10          (f)     delaying HAMP trial periods and determinations of whether

11  Plaintiffs and Class Member in trial modifications qualified for permanent

12  modifications by, among other things, (i) requesting unnecessary and/or

13  duplicative verification documents; (ii) slowing and obstructing the underwriting

14  process; and (iii) allocating insufficient adequately-trained personnel to process

15  loan modification requests.

16          (g)     failing to inform Plaintiffs and Class Members that any trial

17  modification period is virtually certain to last longer than 90 days;

18          (h)     failing to promptly communicate to Plaintiffs and Class

19  Members that they are not eligible for permanent HAMP modifications;

20          (i)     failing to inform Plaintiffs and Class Members that they do not

21  qualify for HAMP modification, then offering them deceptive and less favorable

22  "Citi Affordable Modifications";

23          (j)     failing to waive all late fees for borrowers who comply with all

24  terms of HAMP TPPs;

25          (k)     charging unreasonable and unconscionable fees, including

26  repeated inspection fees even though property inspections are unnecessary after the

27  initial inspection;

28

(l) reporting loan payments to consumer credit agencies as delinquent for borrowers who do not miss any loan payments and comply with the terms of their TPP agreements;

(m) failing to disclose to Plaintiffs and Class Members that if they are denied a permanent modification, Citi would demand immediate and sizeable balloon payments, plus late fees and other delinquency related fees;

(n) failing to disclose to borrowers before, during and after the loan modification process the type, nature and amount of fees and expenses being assessed to their accounts.

217. As a result of Citi's conduct, Plaintiffs and Class Members have been aggrieved. Under Fla. Stat. § 501.211(1), Plaintiffs seeks declaratory and injunctive relief.

218. As a result of Citi's conduct, Plaintiffs Chui and Verdini and other Class Members suffered actual damages, calculated as the sum of all inspection fees after the initial inspection fee.

219. Plaintiffs and Class Members are entitled to declaratory relief, injunctive relief, costs and attorneys' fees. In addition, Plaintiffs Chui and Verdini, Daniel, and Junk Fee Class members are entitled to damages. Fla. Stat. §§ 501.211(1) and (2), 501.2105.

## COUNT VII
### Violation of California Business and Professions Code Section 17500 *et seq.*
### (By Plaintiffs King, Glennon, Bernard, and the Betancourts
### Against Defendant)

220. Plaintiffs incorporate the above allegations by reference as though fully set forth herein.

221. Throughout the Class Period, Citi engaged in a mass advertising and marketing campaign regarding its participation in HAMP and other loan modification and hardship assistance programs, its commitment to helping

1  customers prevent mortgage default and foreclosure through loan modifications,
2  and boasted about its success in helping customers under HAMP and other loan
3  modification programs on a nationwide basis, including in California.

4      222.  Citi engaged in its advertising and marketing with intent to directly or
5  indirectly solicit customers to inquire about HAMP and other loan modification
6  programs.  By advertising and representing that it was participating in HAMP, Citi
7  implicitly represented its compliance with HAMP's well-publicized rules on loan
8  modification processing and underwriting.

9      223.  Citi's advertising and representations were made on its website at
10  www.Citi.com and through written materials sent to borrowers, such as the TPP
11  Agreements and Notices, attached hereto as Exhibits A-E.

12      224.  Citi failed to disclose material information to borrowers, such as the
13  risks of entering a HAMP trial modification period with Citi.  Specifically, Citi
14  failed to disclose that:

15          (a)  Citi failed adequately to screen Plaintiffs and Class Members
16  for eligibility before placing them in trial modifications, and they might not receive
17  permanent loan modifications;

18          (b)  the purported "trial" period could and likely would last for far
19  longer than three months because Citi lacked adequate resources to timely process
20  modification requests;

21          (c)  Citi could deny a modification and terminate the trial
22  modification at any point, and immediately demand a sizeable balloon payment,
23  plus late and delinquency fees;

24          (d)  Citi would report modified payments of Plaintiffs and Class
25  Members who were current when they entered a trial modification as late or in
26  default to credit bureaus; and

27

28

1   (e)   Citi would charge borrowers numerous fees, such as late fees

2   and inspection fees.

3   225.   Contrary to Citi's advertising, the most common result of attempting

4   to modify a loan with Citi was that borrowers would be left in a worse position

5   than before.

6   226.   Citi's advertisements and marketing representations are false,

7   misleading, and likely to deceive the public and/or deceived the public because

8   they falsely represented the nature of Defendant's trial modification programs

9   and/or their benefits, and concealed material information about risks, as described

10  above.

11  227.   In making and disseminating the alleged advertising, Citi knew or

12  should have known that the statements were untrue or misleading, in violation of

13  California Business and Professions Code Section 17500, *et seq.*

14  228.   As a result of Defendant's conduct, Plaintiffs and Class Members

15  suffered injury in fact and lost money and/or property, including damage to their

16  credit, additional debt, late fees and delinquency expenses. Plaintiffs and Class

17  Members would not have inquired about or entered the trial modification period, or

18  made modified payments as represented to them under it, had they been aware of

19  the false, misleading and incomplete nature of Citi's representations about its loan

20  modification programs.

21  229.   Plaintiffs and Class Members seek restitution, declaratory and

22  injunctive relief, and other relief permitted under Section 17535.

23  **COUNT VIII**
**Violation of California Business and Professions Code Section 17200 *et seq.***

24  **(By Plaintiffs King, Glennon, Bernard, and the Betancourts**
**Against Defendant)**

25

26  230.   Plaintiffs incorporate the above allegations by reference as though

27  fully set forth herein.

28

CONSOLIDATED CLASS ACTION COMPLAINT  | - 45 - | CASE NO.: CV 10-03792 DSF (PLAx)

DOCS\535125v4

231.  By engaging in conduct described above, Citi committed one or more acts of "unfair competition" within the meaning of Business & Professions Code Section 17200.

232.  Citi committed "unlawful" business acts or practices by, among other things, (a) engaging in false advertising in violation of Business and Professions Code Section 17500, (b) violating California Civil Code section 1788, (c) violating California Civil Code section 1785.25(a), (d) violating Florida Statute § 501.201, (e) systematically breaching the trial modification contracts and agreements with Plaintiffs and Class Members, (f) systematically breaching contractual limitations on permissible fees in Plaintiffs' and Class Members' deeds of trust, (g) systematically breaching the implied covenant of good faith and fair dealing, and/or (h) inducing Plaintiffs and Class Members to rely on Citi's promises to their detriment.

233.  Citi committed "unfair" business acts or practices by, among other things:

(a)    engaging in conduct where the utility of such conduct, if any, is outweighed by the gravity of the consequences to Plaintiffs and Class Members;

(b)    engaging in conduct that is immoral, unethical, oppressive, unscrupulous, or substantially injurious to Plaintiffs and Class Members; and

(c)    engaging in conduct that undermines or violates the spirit or intent of the consumer protection laws alleged in this Complaint.

234.  Citi committed "fraudulent" business acts or practices by, among other things, engaging in conduct Citi knew or should have known was likely to and did deceive the public, including Plaintiffs and Class Members.

235.  As detailed above, Citi's unlawful, unfair and fraudulent practices include, but are not limited to, the following:

1         (a)    representing that Plaintiffs and Class Members were applying

2  for and being evaluated for HAMP modifications consistent with HAMP

3  requirements, and failing to comply with HAMP requirements;

4         (b)    making false and misleading representations that trial

5  modification periods would lead to permanent modifications if Plaintiffs and Class

6  Members made timely modified payment and complied with documentation

7  requests;

8         (c)    failing to determine it Plaintiffs and Class Members are eligible

9  for HAMP before putting them into HAMP TPPs;

10         (d)    failing to timely determine qualification for permanent HAMP

11  modification upon receipt of a borrower's first TPP payment and verification

12  documents or before the end of the three-month trial period;

13         (e)    failing to provide Plaintiffs with adequate information

14  regarding its loan modification programs;

15         (f)    delaying HAMP trial periods and determinations of whether

16  Plaintiffs and Class Member in trial modifications qualified for permanent

17  modifications by, among other things, (i) requesting unnecessary and/or

18  duplicative verification documents; (ii) slowing and obstructing the underwriting

19  process; and (iii) allocating insufficient adequately-trained personnel to process

20  loan modification requests.

21         (g)    failing to inform Plaintiffs and Class Members that any trial

22  modification period is virtually certain to last longer than 90 days;

23         (h)    failing to promptly communicate to Plaintiffs and Class

24  Members that they are not eligible for permanent HAMP modifications;

25         (i)    failing to inform Plaintiffs and Class Members that they do not

26  qualify for HAMP modification, then offering them deceptive and less favorable

27  "Citi Affordable Modifications";

28

1                (j)    failing to waive all late fees for borrowers who comply with all

2  terms of HAMP TPPs;

3                (k)    charging unreasonable repeat inspection fees even though

4  property inspections are unnecessary after the initial inspection;

5                (l)    reporting loan payments to consumer credit agencies as

6  delinquent for borrowers who do not miss any loan payments and comply with the

7  terms of their TPP agreements;

8                (m)    failing to disclose to Plaintiffs and Class Members that if they

9  are denied a permanent modification, Citi would demand immediate and sizeable

10  balloon payments, plus late fees and other delinquency related fees;

11               (n)    failing to disclose to borrowers before, during and after the loan

12  modification process the type, nature and amount of fees and expenses being

13  assessed to their accounts.

14      236.  As a result of Defendant's conduct, Plaintiffs and Class Members

15  suffered injury in fact and lost money and/or property, including damage to their

16  credit, additional debt, late fees and delinquency expenses.  Plaintiffs and Class

17  Members would not have inquired about or entered the trial modification period, or

18  made modified payments as represented to them under it, had they been aware of

19  the false, misleading and incomplete nature of Citi's representations about its loan

20  modification programs.

21      237.  Plaintiffs and Class Members seek restitution, declaratory and

22  injunctive relief, and other relief permitted under Section 17203.

23                        **PRAYER FOR RELIEF**

24      WHEREFORE, Plaintiffs, on behalf of themselves and all others similarly

25  situated pray for judgment against Defendant as follows:

26      A.    An order certifying this case as a class action and appointing Plaintiffs

27  and their counsel to represent the Class members;

28

1     B.    Restitution to Plaintiffs and Class members;

2     C.    Actual damages for injuries suffered by Plaintiffs and Class members;

3     D.    An order declaring Citi's alleged acts and practices to constitute a

4  breach of contract and a breach of the covenant of good faith and fair dealing;

5     E.    An order declaring that Citi is required under the doctrine of

6  promissory estoppel to offer permanent modifications to Plaintiffs and Class

7  members on the terms promised in their trial period modifications;

8     F.    A permanent or final injunction enjoining Citi's agents and

9  employees, affiliates and subsidiaries, from continuing to harm Plaintiffs and the

10  Class;

11     G.    An order requiring Citi to adopt and enforce a policy that provides

12  appropriate training of its employees and agents regarding their duties under loan

13  modification and other hardship assistance programs;

14     H.    An order for Citi's specific performance of its contractual obligations

15  together with other relief required by contract and law;

16     I.    Reasonable attorneys' fees and the costs of this action;

17     J.    Statutory pre-judgment interest; and

18     K.    Such other relief as this Court may deem just and proper.

19                   **DEMAND FOR JURY TRIAL**

20     Plaintiffs hereby demand trial of their claims by jury to the extent authorized

21  by law.

22  DATED: November 8, 2010     **MILBERG LLP**
                               JEFF S. WESTERMAN

23                         SABRINA S. KIM

24

25                         *Sabrina S. Kim / AfS*
                             SABRINA S. KIM

26

27

28

One California Plaza
300 S. Grand Avenue, Suite 3900
Los Angeles, CA 90071
Telephone: (213) 617-1200
Facsimile: (213) 617-1975
Email: jwesterman@milberg.com

**MILBERG LLP**
ANDREI V. RADO
arado@milberg.com
JESSICA J. SLEATER
jsleater@milberg.com
One Pennsylvania Plaza, 49th Floor
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229

*Counsel for Plaintiffs*
*Beverly King and Nancy Glennon*

**FINKELSTEIN THOMPSON LLP**
ROSEMARY M. RIVAS
TRACY TIEN
100 Bush Street, Suite 1450
San Francisco, CA 94104
Telephone: (415) 398-8700
Facsimile: (415) 398-8704
Email:
rrivas@finkelsteinthompson.com
ttien@finkelsteinthompson.com

**PHILLIPS & GARCIA, P.C.**
ANDREW J. GARCIA
CARLIN J. PHILLIPS
13 Ventura Drive
Dartmouth, MA 02747
Telephone: (508) 998-0800
Facsimile: (508) 998-0919

*Counsel for Plaintiffs Hanna*
*Bernard, Carla Chui, Maurizio*
*Verdini, and Elizabeth Daniel*

| CONSOLIDATED CLASS ACTION COMPLAINT | - 50 - | CASE NO.: CV 10-03792 DSF (PLAx) |
| --- | --- | --- |

DOCS\535125v4

**THE STURDEVANT LAW FIRM**
JAMES C. STURDEVANT
WHITNEY HUSTON
A Professional Corporation
354 Pine Street, Fourth Floor
San Francisco, California 94104
Telephone: (415) 477-2410
Facsimile: (415) 477-2420
Email:
jsturdevant@sturdevantlaw.com
whuston@sturdevantlaw.com

**HOUSING AND ECONOMIC
RIGHTS ADVOCATES**
MAEVE ELISE BROWN
ELIZABETH S. LETCHER
NOAH ZINNER
CYNTHIA SINGERMAN
1814 Franklin Street, Suite 1040
Oakland, CA 94612
Telephone: (510) 271-8443
Facsimile: (510) 868-4521
Email: melisebrown@heraca.org
eletcher@heraca.org
csingerman@heraca.org

*Counsel for Plaintiffs Maria and
Pedro Betancourt*

| CONSOLIDATED CLASS ACTION COMPLAINT | - 51 - | CASE NO.: CV 10-03792 DSF (PLAx) |
|---|---|---|

DOCS\535125v4